Brian K. Jackson (15296)
Brian K. Jackson, LLC
503 W. 2600 S. Suite 200
Bountiful, Utah 84010
Phone: (801) 441-8922
brianj@bjacksonlaw.com
Attorney for Susan Hornbuckle

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| Susan Hornbuckle;<br>    Plaintiff,<br>v.<br><br>Kelly Services, INC.;<br>    Defendants, | **COMPLAINT**<br><br>Civil No.:<br><br>*Jury Trial Requested* |

Plaintiff, Susan Hornbuckle, through retained counsel, Brian K. Jackson of Brian K. Jackson, LLC, the United States District Court of Utah, now brings the following claims against Defendant, Kelly Services and requests for relief based on the described claims identified below.

## PARIES, JURISDICTION AND VENUE

1.      Plaintiff, Susan Hornbukle a resident of Utah, Weber County, is a former employee of Defendant, Kelly Services.

2.      Defendant, Kelly Services, a corporation whose principal headquarters are located in Troy, Michigan is a staffing services company that helps locate employees for contracted businesses and has a registered agent in the State of Utah with CT Corporation system at 1108 E South Union Ave Midvale, UT 84047.

3. Subject matter jurisdiction is proper. This action is brought under federal law under Title VII of the Civil Rights Act. This court also has diversity jurisdiction as this case involves two different residents of separate states with a claim or controversy that exceeds $75,000.00.

4. Venue and personal jurisdiction is proper as the facts in these claims arose out of an employment contract with Ms. Hornbuckle entered in Weber County, Utah and the incidents alleged also occurred within that county. Ms. Hornbuckle was a director for the company and over contracts the company had within the State of Utah. The contracts with businesses through clients and employment contract with Ms. Hornbuckle and other Utah employees were continuous and systematic. Ms. Hornbubkle worked there for over 6 years. The company had business and client contracts within the state of Utah for over 6 years. The company also benefited from the laws and protections of the state of Utah and knew when entering in client contracts and employee contracts that they had personally availed themselves to the jurisdiction of that state.

## LEGAL CLAIMS

5. Kelly Services promoted Ms. Hornbuckle as interim market leader on or about October of 2019. Ms. Hornbuckle had worked as a Vice President for Kelly Services six years prior to that.

6. At the time of termination, Ms. Hornbuckle had retirement benefits, health insurance, including medical, dental and vision as well as life insurance. Ms. Hornbuckle grossed $32,076.42 for 2020 through March 8th, 2020. Ms. Hornbuckle was also hitting 100% of her incentive target.

7. Kelly Services employees over 500 employees.

8.      On November 19th, 2019, Ms. Hornbuckle made a complaint to Human Resources on behalf of another employee, Jennifer Grove in opposition to issues as to harassment and a hostile work environment with concerns it was based on the employee's race.

9.      Ms. Hornbuckle also raised concerns about treatment she received from other employees and felt like she was being pushed out. The issues also arose and stemmed from another Human Resources investigation regarding Ms. Hornbuckle's former supervisor who had been terminated.

10.     Ms. Hornbuckle was not given the actual salary amount in the interim role, but for a 10% interim pay increase of her base salary, nor was she given the official title while she worked in the interim role. The original role's salary was $300,000.00 a year.

11.     Ms. Hornbuckle later had a conversation with Human Resources on December 9th and was directed to talk to Ms. Pennino to address the issues regarding the employee Ms. Hornbuckle had complained on behalf of. Shana Sagasta, Ms. Pennino's direct supervisor, indicated to Ms. Hornbuckle she would address the issues with Ms. Pennino as Ms. Sagasta believed she would respond better to her rather than to Ms. Hornbuckle. Human Resources through Susan Medina told Ms. Hornbuckle that Ms. Pennino needed to be told that Kelly Services had zero tolerance to bullying and that her behavior had to change. Ms. Medina further instructed Ms. Hornbuckle to notify Ms. Pennino that if the behavior continued there would be formal disciplinary action up to and including termination. Ms. Hornbuckle was also told to hold a team meeting to set expectations, discuss roles and reinforce Kelly's position on bullying.

12.     During this same meeting Ms. Medina raised additional concerns about an Account Executive who worked closely with Ms. Pennino in the Tempe, AZ office, Darrin Cooke. Ms. Medina stated that there were integrity issues related to Mr. Cooke's accounts which allowed

him to earn commissions on orders he did not generate which is a direct violation of the company policy. Ms. Hornbuckle was instructed to conduct an audit of these accounts and properly align sales credit for these orders according to company policy.

13. On or about December 19th, 2019, issues continued to arise with Ms. Pennino and Jennifer Grove with communication and their respective job duties. Ms. Grove reached out to Ms. Hornbuckle for assistance in composing an e-mail to send to Ms. Pennino to try and resolve their issues.

14. Ms. Pennino responded to the email defensively, indicating that she didn't think she did anything wrong and felt her actions were in line with her job duties.

15. On January 16th, Ms. Hornbuckle and Ms. Sagasta agreed Ms. Sagasta would talk to Ms. Pennino about her bullying behavior and Ms. Hornbuckle would follow up with Ms. Pennino after that conversation. Later that day, Ms. Hornbuckle also had a conversation with Ms. Pennino and let Ms. Pennino know about the zero tolerance policy for bullying and if the issues persisted, there would be disciplinary action up to and including termination.

16. On January 21st, Ms. Hornbuckle e-mailed Human Resources in relation to the situation regarding Darrin Cooke and to provide an update on the situation with Ms. Grove and Ms. Pennino. In that email Ms. Hornbuckle explains that the situation was improved but there were still some issues that needed to be addressed. Specifically, that Ms. Pennino was not assigning orders to Ms. Grove as instructed which resulted in Ms. Grove being unable to complete required tasks and activities of which her performance was measured.  The day prior, Ms. Hornbuckle sent an e-mail to Shana Sagasta noting her concern with Ms. Pennino's failure to assign a significant number of orders to Ms. Grove.

17.     Later, on January 21st, Audrey Greiss filed a complaint with Human Resources with the claim of concerns Ms. Hornbuckle had friends in Human Resources and that employee concerns wouldn't be taken seriously or she would be made aware of who was filing the complaints. Ms. Greiss goes on to inquire with Human Resources about the process for applying for the Interim Market Leader role, the role held by Ms. Hornbuckle at that time.  Ms. Greiss also claimed she thought Ms. Hornbuckle was targeting Mr. Cooke and intended to push him out of Kelly and that "she had been after him for months."  Ms. Greiss also claimed that Ms. Hornbuckle had a call set for 30 minutes and kept over 70 employees on the phone for 90 minutes.

18.     Another anonymous complaint was filed the day after the January 16th encounter. The complaint claimed that Ms. Hornbuckle showed favoritism toward Ms. Grove and did not require her to file reports like other employees and that she was not required to attend conference calls that others were required to attend. The complainant claimed he or she had e-mails to show proof of her aggressively reprimanding employees. It also claimed she held conference calls with lack of an agenda. This anonymous complaint was from Ms. Pennino and came in the day after Ms. Hornbuckle spoke to her about her behavior from the direction of Human Resources. Ms. Hornbuckle denied these allegations and provided Ms. Medina with evidence to the contrary. The evidence included the attendees list for these conference calls which showed Ms. Grove was on all of these calls. Ms. Hornbuckle further directed Ms. Medina to the call transcripts and PowerPoint Presentations shared during these calls. This evidence contradicts the claims made by Ms. Pennino and shows Ms. Hornbuckle recognized Ms. Pennino and Mr. Cooke every week and had not recognized Ms. Grove at all. This evidence proves Ms. Pennino's claim that Ms. Hornbuckle was hosting these meetings with no agenda was also disingenuous. These conference

calls were structured with a clear and concise agenda which was shared at the beginning of each call and followed the same format every week.

19.     Ms. Pennino also wrote an e-mail to Human Resources on January 21st with the claim that she was being bullied, reprimanded by a peer and humiliated by a coworker. She claimed that Ms. Grove was bullying her and that the bullying was being backed by Ms. Hornbuckle.

20.     On February 20th, 2020 Ms. Pennino sent an e-mail to Human Resources with concerns about a survey she was asked to fill out which she claimed targeted specific concerns and made her feel uncomfortable. Ms. Hornbuckle also denied this allegation and provided Ms. Medina with the survey and explained that it was in fact sent to every employee in the market (the email recipient list has also been provided to Kelly) and that the survey was not created or sent by Ms. Hornbuckle, rather it was created and administered by the market admin with collaboration of the entire leadership team

21.     Another complaint made by Mr. Cooke claimed that Ms. Hornbuckle and Ms. Grove were discriminating against Ms. Pennino because she was African American.

22.     On February 20th, 2020, Ms. Hornbuckle had a conversation with Human Resources. Ms. Hornbuckle was told she would be suspended while the company investigated the allegations against her. The only allegations addressed during this conversation with Ms. Hornbuckle included 1) the claim that she was showing favoritism toward Ms. Grove some and bias against others; 2) that Ms. Grove was egregiously bullying others in emails since August; and 3) that Ms. Hornbuckle was holding too many "impromptu" meetings requiring everyone to stay on the line for 90 minutes.

23.     Ms. Hornbuckle responded to the allegations indicating she felt she was being targeted by one small group of individuals that didn't want her in that role and this had come about due to

the complaints she made on behalf of Ms. Grove. Ms. Hornbuckle also indicated she needed more details about the impromptu meetings that were referred to. Ms. Hornbuckle also asked to see the e-mails in question from Ms. Grove that were considered bullying as Ms. Hornbuckle had not seen any emails that were described to her during her conversation with Ms. Medina. Ms. Hornbuckle also indicated that she was not friends with Ms. Grove outside of work. Ms. Hornbuckle also denied holding the meetings and offered to share her calendar with Human Resources which would easily disprove this allegation.

24. On or about March 5th, 2020 Ms. Hornbuckle was told that the investigation was completed and that she was terminated. Ms. Hornbuckle was told she was terminated for creating a toxic worksite environment and poor employee communication. The exact words were "we have concluded the investigation into the allegations and have made the decision to terminate your employment, due to the toxic work environment you created and the bullying emails sent by Jennifer Grove."

25. Ms. Hornbuckle maintains that based on the factual summary explained above incorporated into the causes of action that Kelly Services is liable for the following legal claims:

    **I.    Retaliation under Title VII of the Civil Rights Act**

26. Ms. Hornbuckle engaged in protected activity when she opposed an unlawful employment practice based on race-based bullying toward Ms. Grove from Ms. Pennino on or about November of 2019 as well as the treatment she had also received prior.

27. Instead of Human Resources handling the issue itself, they told Ms. Hornbuckle to resolve the issue with Ms. Grove's complaint in December of 2019. Human Resources also instructed Ms. Hornbuckle to investigate Darrin Cooke's orders.

Complaint
Susan Hornbuckle
v. Kelly Services INC.   7

28. Ms. Hornbuckle engaged in protected activity when she communicated to Ms. Pennino the instructions from Human Resources about zero tolerance for work-site bullying and harassment and possible termination.

29. Ms. Hornbuckle also engaged in protected activity during the investigation of the allegations against her when she was placed on leave. At that time, Ms. Hornbuckle indicated in opposition about the complaints that were made against her. Ms. Hornbuckle noted it was a result of the complaints she made on behalf of Ms. Grove and communication she had with Pennino with instructions from Human Resources. Ms. Hornbuckle was also part of protected activity in opposing any claim against her that her actions were based on race as part of the investigation.

30. Immediately after a conversation Ms. Hornbuckle had with Ms. Pennino on bullying and harassment that Human Resources directed Ms. Hornbuckle to do, Ms. Pennino made complaints against Ms. Hornbuckle as to favoritism toward Ms. Grove. The complaint occurred after a conversation with Ms. Pennino as well as other complaints from Mr. Cooke and Ms. Geiss on behalf of Ms. Pennino within that time as well.

31. The complaints were adverse employment actions toward Ms. Hornbuckle for telling Ms. Pennino about zero tolerance for bullying and harassment in the workplace toward Ms. Grove. Additionally, as part of Ms. Geiss' complaint, Ms. Geiss was inquiring about Ms. Hornbuckle's position. Ms. Geiss in her complaint also claimed that Human Resources was showing favoritism toward Ms. Hornbuckle.

32. The placement of Ms. Hornbuckle on leave during the investigation was also adverse action against Ms. Hornbuckle for opposing bullying in the workplace at the direction of Human Resources.

33.     Instead of Human Resources conducting a full investigation from the complaint of Ms. Hornbuckle, including speaking to Ms. Pennino about the claims which based on information or belief, it never did, it told Ms. Hornbuckle to issue the warnings to Ms. Pennino. Human Resources later retaliated against Ms. Hornbuckle for issuing the warnings to Pennino at their request with the placement of Ms. Hornbuckle on leave.

34.     Human Resources also knew that it had directed Ms. Hornbuckle to issue the warning to Ms. Pennino finding a violation of work-site bullying of Ms. Pennino toward Ms. Grove. This made it look like Ms. Hornbuckle was unilaterally favoring Ms. Grove. Instead of indicating as part of the investigation they had directed Ms. Hornbuckle to reprimand Ms. Pennino, it terminated Ms. Hornbuckle to make it look as if it was a unilateral decision of Ms. Hornbuckle to verbally reprimand her and her favoritism toward Ms. Grove.

35.     Human Resources retaliated against Ms. Hornbuckle with its failure to properly step-in and resolve the issues with Ms. Grove and Ms. Pennino at the onset. The failures of which created a hostile work environment with Ms. Hornbuckle with the complaints that were later made against her for doing Human Resources' job. Had Human Resources verbally communicated the zero tolerance policy to Ms. Pennino, there would have been no claim that Ms. Hornbuckle was favoring Ms. Grove. The complaints from Ms. Pennino did not come until after Ms. Hornbuckle spoke to Ms. Pennino regarding her treatment of Ms. Grove.

36.     Additionally, if Human Resources had done its own investigation on Mr. Cooke, instead of directing Ms. Hornbuckle to investigate him, there would have been no complaints that Ms. Hornbuckle was targeting Mr. Cooke based on his race.

37.     The termination of Ms. Hornbuckle was proximately caused by the complaints of Mr. Cooke, Ms. Geiss and Ms. Pennino, who acted in concert after Ms. Hornbuckle reprimanded Ms.

Pennino. The e-mails from Ms. Greiss also indicate she knew the allegations were false as her intention was to have Ms. Hornbuckle terminated so she could get her position. The complaints were due to Human Resources failure to properly investigate and address issues delegated to them made by Ms. Hornbuckle and made the situation worse for Ms. Hornbuckle. It also resulted in Human Resources failure to acknowledge and admit Ms. Hornbuckle was engaged in protected activity with the complaints made against her.

38. Ms. Hornbuckle was also ultimately terminated for incidents between Ms. Grove and Ms. Pennino as well as with other employees that Ms. Hornbuckle was not a part of but opposed with her communication to the employees and to Human Resources.

39. Ms. Hornbuckle was also ultimately terminated for false allegations against her that she was discriminating against other individuals based on race which Human Resources knew was false as she was acting under the direction of Human Resources. Ms. Hornbuckle also gave evidence to Human Resources to show the falsity of all of the allegations against her.

## II. Hostile Work Environment under Title VII of the Civil Rights Act

40. Human Resources also created a hostile work environment that was severe and pervasive with its failure to properly address the issues Ms. Hornbuckle initially raised to Human Resources.

41. Instead of investigating the claims properly and speaking to Ms. Pennino and resolving the issues, in November of 2019, Human Resources didn't speak to Ms. Pennino but directed Ms. Hornbuckle to give Ms. Pennino a verbal reprimand.

42. Human Resources failure created a hostile work environment as it made employees make complaints against Ms. Hornbuckle with claims that it looked like she was favoring other

employees and or it allowed these employees to make false allegations against Ms. Hornbuckle to claim that it was based on race with the actions Ms. Hornbuckle was directed to take.

43. Three complaints were made against Ms. Hornbuckle on the same day after the verbal reprimand to Ms. Pennino with false and inaccurate information and perceptions. Human Resources knew that the actions were at their direction as well as the perceived favoritism.

44. Instead, Human Resources enabled these individuals and made it appear as if they were unaware of their involvement with Ms. Grove, Ms. Pennino and Ms. Hornbuckle's role with the investigation against Ms. Hornbuckle that ultimately led to her termination. Human Resources also enabled these individuals to make it look as if Ms. Grove was the one bullying and that Ms. Hornbuckle enabled it despite their awareness of how Ms. Pennino treated Ms. Grove and direction to Ms. Hornbuckle to give Ms. Pennino a verbal reprimand.

45. The amount of complaints and their falisty and Human Resources enabling these individuals despite knowing Ms. Hornbuckle's role at their direction is severe and pervasive conduct. Terminating Ms. Hornbuckle due to the atmosphere Human Resources on its own created is severe and pervasive conduct.

46. The same individuals that targeted Ms. Grove and complained about Ms. Hornbuckle continued to target her and bully her after Ms. Hornbuckle's termination. These individuals also targeted other individuals as well.

### III. Wrongful Termination under Title VII of the Civil Rights Act

47. Ms. Hornbuckle was also ultimately wrongfully terminated based on her opposing the conduct identified in the retaliation section. Ms. Hornbuckle was also ultimately terminated based on the hostile work environment created identified in the hostile work environment section.

48. Ms. Hornbuckle was also wrongfully terminated with false claims that she created a toxic work atmosphere and showed favoritism toward other employees based on race and enabled Ms. Grove to bully other individuals.

49. Ms. Hornbuckle initially raised the issues about Ms. Grove to Human Resources to resolve which Human Resources knew and provided direction to Ms. Hornbucle to verbally reprimand Ms. Pennino. With that, Human Resources knew Ms. Hornbuckle was not showing favoritism toward Ms. Grove and that it was not a race-based decision but was at Human Resources' direction.

50. Human Resources also knew that it had directed Ms. Hornbuckle to investigate Mr. Cooke and knew that it was at its direction and not race-based.

51. Human Resources also knew that the false allegations about the longer meetings that Ms. Grove didn't have to attend was false and that Ms. Hornbuckle did not create the survey related to the complaint by Ms. Pennino.

### IV. Damages under Title VII Violations

52. Ms. Hornbuckle suffered from lost wages and benefits due to the allegations alleged in this complaint as well as consequential damages including lost savings. The total lost wages is at least $113,209.41 in addition to roughly $64,000.00 in other benefits for the Title VII claims in addition to lost commissions.

53. Ms. Hornbuckle had a job offer from Scion which was ultimately rescinded due to the delays of Kelly Services in responding to the non-compete where she was to get $220,000.00 as a base pay. Ms. Hornbuckle started a new position on November 30th, 2020, her base there is $185,000.00 plus commission.

54. Ms. Hornbuckle also had to take $75,000.00 out of savings and out of her husband's retirement account to counteract the loss of income. Ms. Hornbuckle also incurred a lot of credit card debt during the 9 months she was unemployed.

55. Ms. Hornbuckle also suffered from emotional distress as a result of the complaints, termination and treatment from Human Resources including loss of sleep, she almost lost her marriage, and suffered from crying and suicidal thoughts.

56. Ms. Hornbuckle also seeks recoupment of attorney fees and costs as authorized under the Title VII statute as well as pre and post interest on judgment.

57. Ms. Hornbuckle also seeks punitive damages for each violation. Human Resources knew Ms. Hornbuckle had originally made a complaint to them regarding the treatment of Ms. Grove. Human Resources knew it had directed Ms. Hornbuckle to reprimand Ms. Pennino verbally and investigate Mr. Cooke. Human Resources ultimately terminated Ms. Hornbuckle for this falsely claiming that Ms. Hornbuckle created a toxic work environment with that knowledge and that Ms. Hornbuckle was favoring other employees.

58. As a result, Human Resources knew it was retaliating against Ms. Hornbuckle with the adverse actions against her in violation of Title VII or at least with the perceived risk it was retaliating against Ms. Hornbuckle for opposing the work environment and bullying. Kelly Services should be required to pay punitive damages as well due to its intentional actions.

WHEREFORE, Ms. Hornbuckle respectfully seeks and prays the following relief:

1. For a jury to be enabled to determine the facts Ms. Hornbuckle alleges.

2. For judgment in Ms. Hornbuckle's favor based on the facts described in this complaint.

3. For damages based on the damage claims alleged in this complaint.

4. For a cease and desist order ordering Defendant to stop all retaliatory actions.

5. For any other relief the court would deem fit.

                                                 Submitted this 15th day of March, 2021

                                                 <u>/s/ Brian K. Jackson</u>
                                                 Brian K. Jackson
                                                 Brian K. Jackson, LLC
                                                 Attorney for Plaintiff